**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (CLEVELAND)**

| | |
|---|---|
| ALYSE GOTHOT, on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>v.<br><br>NURTURE, INC., d/b/a/ Happy Family Brands,<br><br>               Defendant. | Case No.   **1:21-cv-742**<br><br>**CLASS ACTION COMPLAINT**<br><br>FOR VIOLATIONS OF:<br><br>1. Ohio's Consumer Sales Practices Act;<br><br>2. Ohio's Deceptive Trade Practices Act;<br><br>3. Various State Consumer Protection Acts; and<br><br>4. Unjust Enrichment<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

JURISDICTION ......................................................................................................... 3

PARTIES .................................................................................................................... 4

FACTUAL ALLEGATIONS ....................................................................................... 4

    I. The Defendant Markets and Labels Its Products as Wholesome Premium Foods for Children and Reasonable Consumers Relied on Defendant's Representations .................. 4

    II. The Truth is Revealed ....................................................................................... 9

    III. The Danger of the Toxicants Found In Defendant's Products And The Defendant's Sale of the Contaminated Products ............................................................................. 11

    IV. Due to Defendant's Misconduct, Plaintiff and the Class Suffered Economic Injury ....................................................................................................................... 15

CLASS ACTION ALLEGATIONS ............................................................................ 15

CLAIMS FOR RELIEF ............................................................................................. 19

    FIRST CLAIM FOR RELIEF: OHIO'S CONSUMER SALES PRACTICES ACT (ORC §§ 1345.01, et seq.) ........................................................................................... 19

    SECOND CLAIM FOR RELIEF: OHIO DECEPTIVE TRADE PRACTICES ACT (ORC §§ 4165.01, et seq.) ........................................................................................... 20

    THIRD CLAIM FOR RELIEF: VIOLATION OF VARIOUS STATE CONSUMER PROTECTION ACTS ............................................................................................. 21

    FOURTH CLAIM FOR RELIEF: UNJUST ENRICHMENT ......................................... 23

JURY DEMAND AND PRAYER FOR RELIEF ....................................................... 24

Plaintiff Alyse Gothot, by and through counsel, brings this Class Action Complaint against Defendant Nurture, Inc. ("Nurture" or "Defendant"), on behalf of herself and all others similarly situated, and allege the following based on personal knowledge and on the investigation made by her attorneys.

## INTRODUCTION

1.      Defendant, Nurture, Inc., sells premium-priced organic baby food products under the Happy Family and Happy Baby brand names, including puffs, rice cakes, cereal and teethers (collectively the "Products").[1] Defendant has engaged in a uniform, widespread advertising and marketing campaign to convince consumers, including parents, that their Products are superior to other similar products on the market, and that they are "organic," "superfoods" made by a "team of real parents, pediatricians and nutritionists," who "are on a mission to bring health and happiness to our little ones."[2] Contrary to these marketing claims, which are substantively consistent and uniform across the Product labels, the Products contain contaminants: including heavy metals, inorganic arsenic ("arsenic"), lead, cadmium, and mercury (collectively, the "Toxicants"), that public health authorities and child-safety organizations unanimously agree pose serious risks to children's health and well-being.[3]

2.      Defendant knows that food safety is of primary concern to parents and, for this reason, it tests internally for the Toxicants. However, Defendant has failed to heed its own test results and has sold Products with Toxicants exceeding its own internal limits of acceptability. Defendant conceals the existence of these Toxicants in the Products' listed ingredients. The omitted information is wholly inconsistent with the Products' label representations, which are intended to—and do, in fact—persuade reasonable consumers that the Products are wholesome.

---

[1] The Products are: Nurture's "Puff" snacks, Nurture's teethers, Nurture's cereals, Nurture's "cake" snacks, and any other snack-type products that Nurture markets as being suitable for young children.

[2] "Superfoods" are "considered exceptionally good for one's health…." https://www.dictionary.com/browse/superfood?s=t (4/1/21).

[3] "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury," House of Representatives Subcommittee on Economic and Consumer Policy (Committee on Oversight and Reform), Staff Report (Feb. 4. 2021).

3.      In fact, as shown below, on the front and center of every one of its Puffs products, in bold lettering, where it cannot be missed by consumers, Defendant uniformly represents each Product as a "superfood" and "organic grain snack." To reinforce this message, back label of each of the Products uniformly states, in capital letters, "WE ARE A TEAM OF REAL MOMS, PEDIATRICIANS AND NUTRITIONISTS on a mission to bring health and happiness to our little ones and the planet. We create nutritious meals and snacks that make eating enlightened, effortless, and delicious. From our happy family to yours."[4]

4.      Defendant's consistent messaging across different Product formulations, different media, and across all marketing touchpoints means that messaging for any one Product formulation reinforces its inaccurate and misleading claims for other and all formulations.

5.      In reality, and contrary to these pervasive label representations, the Toxicants contained in Defendant's Products are not nutritious and no reasonable parent would feed their child meals and snacks containing elevated and unacceptable levels of arsenic, lead, cadmium, or mercury.

6.      The United States House of Representatives Report, "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium and Mercury" ("Congressional Report") examines Defendant's misconduct. It states: "Even low levels of exposure can cause serious and often irreversible damage to brain development."[5] Defendant's Products not only contain these Toxicants, but contain levels of the Toxicants that are unacceptable by virtually any public health standard, and certainly are unacceptable to reasonable parents. For example, the FDA's limit for safe consumption of arsenic in rice cereal is set at 100 parts per billion ("ppb"). However, the Defendant's in-house testing of its popular "Blueberry Beet Rice Cakes" on February 8, 2017, revealed that the Product contained 120 ppb.[6]

---

[4] *See e.g.* https://www.happyfamilyorganics.com/shop/baby/sweet-potato-carrot-finger-food/, https://www.happyfamilyorganics.com/shop/baby/blueberry-beet-finger-food/.

[5] *Congressional Report* at 2.

[6] *Id.* at 15.

7.     By virtue of this conduct, and all of the conduct alleged herein, Plaintiff and all members of the Class have been injured by the Defendant's actions.[7] This action asserts claims for violations of Ohio state consumer protection statutes (for the Ohio Class), violations of other state consumer protection laws (for the Multistate Class), and unjust enrichment (for the Ohio Class, the Multistate Class, and the National Class). In addition to restitution, damages (including punitive damages), and other compensatory relief, Plaintiff seeks injunctive relief to prevent further false and misleading representations and to require corrective disclosures to rectify Defendant's omissions regarding the Toxicants found in Defendant's products.

## JURISDICTION

8.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d)(2). The amount in controversy, exclusive of costs and interest, exceeds the sum of $5 million in the aggregate. In total, there are well over 100 members of the proposed Classes that are known to exist, and this is a class action in which complete diversity exists between one Plaintiff and one Defendant—specifically, Plaintiff Alyse Gothot is a citizen of Ohio, while Defendant is a citizen of the State of New York.

9.     **General Personal Jurisdiction.** This Court has general personal jurisdiction over Defendant because Defendant has purposefully availed itself of the privilege of doing business within the state, including within this District; has had continuous and systematic general business contacts within the state, including within this District; and Defendant can be said to have reasonably anticipated being haled into court in this forum.

10.     **Specific Personal Jurisdiction.** This Court has specific personal jurisdiction over Defendant because this action arises out of and relates to Defendant's contacts with this forum. Specifically, Defendant knowingly directed the Products through the stream of commerce into this District. Defendant has advertised and marketed within this District through the wires and mails and via e-commerce websites through which residents of this state and District can

---

[7] For convenience and brevity, Plaintiff refers to the three proposed Classes as "the Class" unless that phrase is expressly and specifically defined as applying to only one or two of the proposed classes.

purchase the Products. Defendant knowingly directs electronic activity into this state and District with the intent to engage in business interactions and has in fact engaged in such interactions. Defendant sold the Products in this District, including to Plaintiff, who resides in this District, who purchased the Products in this District, and whose losses were incurred here. Defendant cultivated a market for the Products in this state and District and systematically served a market for the very Products causing the harms alleged in this Complaint. Thus, there is an affiliation between this forum and the underlying controversy and there is a strong relationship among the Defendant, the forum, and the litigation.

11.   **Venue**. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District. Venue also is proper pursuant to 28 U.S.C. 1391(b)(1) and 1391(c)(2) because Defendant is deemed to be a resident of this District by virtue of the Court's personal jurisdiction over Defendant with respect to this action.

## PARTIES

12.   Plaintiff Alyse Gothot is a citizen of the State of Ohio and is a member of the Class as a purchaser of Nurture's Products. Plaintiff purchased the Products at retail—specifically, HappyBaby Sweet Potato & Carrot Superfood Baby Puffs (2.1 oz), for $2.79—and she relied on the Defendant's affirmative health-related representations (and omissions) as described herein. Plaintiff purchased this Product on November 17, 2019.

13.   Defendant Nurture, Inc., is a Delaware corporation with headquarters located at 40 Fulton Street, 17th Floor, New York, New York 10038.

## FACTUAL ALLEGATIONS

**I.    The Defendant Markets and Labels Its Products as Wholesome Premium Foods for Children and Reasonable Consumers Relied on Defendant's Representations and Omissions**

14.   The demand for wholesome baby food products is constant as parents continuously seek to protect their children, as best they can, from all unreasonable risks of harm. Defendant

understands this demand and markets its Products as organic—labeling each of them as such in multiple places.[8] Each of the Product labels, such as the Product depicted below (the Product purchased by Plaintiff), include uniform representations intended to persuade reasonable consumers that the Products are wholesome and fit for "our little ones" as they are made by "real parents, pediatricians, and nutritionists."




---

[8] https://www.iherb.com/pr/Happy-Family-Organics-Superfood-Puffs-Organic-Grain-Snack-Sweet-Potato-Carrot-2-1-oz-60-g/25215 (4/1/21).

15.     Plaintiff purchased the Product depicted above. The representations made on this Product are those relied upon by the Plaintiff.

16.     These representations are intended to impact and do in fact impact every reasonable parent's decision regarding which foods to purchase for their young children.

17.     Plaintiff the Class relied on these representations, specifically the representations conveying the wholesome nature of the product, when making their purchases. These representations include affirmative statements like the claim that the food is formulated by a team of "Real Parents, Pediatricians, and Nutritionists;" but also omissions, including the failure to include any disclaimers or warnings about the Toxicants present in unacceptable levels. The representations and omissions are reinforced by wholesome imagery (fruits, vegetables, and the like) and attributes like "organic superfood," "gluten free" and "non-GMO."

18.     Other Products in the Product family have substantively identical labels:[9]



---

[9] https://www.iherb.com/pr/Happy-Family-Organics-Superfood-Puffs-Organic-Grain-Snack-Strawberry-Beet-2-1-oz-60-g/25216; https://www.iherb.com/pr/Happy-Family-Organics-Superfood-Puffs-Organic-Grain-Snack-Purple-Carrot-Blueberry-2-1-oz-60-g/69318; https://www.iherb.com/pr/Happy-Family-Organics-Superfood-Puffs-Organic-Grain-Snack-Kale-Spinach-2-1-oz-60-g/25214; https://www.iherb.com/pr/Happy-Family-Organics-Superfood-Puffs-Organic-Grain-Snack-Banana-Pumpkin-2-1-oz-60-g/25213 (4/1/21).

   

19.     Not only is the Defendant aware that parents, like Plaintiff, rely upon these representations (and omissions), but Defendant charges a premium for them as a result. Plaintiff and the Class would not have paid the premium had they known what the Defendant knows by virtue of its own in-house testing: that the Products are laden with toxic ingredients not listed on the label. Defendant conceals the presence and elevated levels of the Toxicants because no reasonable parent would purchase the products at the price offered, or on the same terms, or as frequently, if this information were disclosed.

20.     As the manufacturer and seller of the Products, Defendant is responsible for the accuracy of information conveyed on the Product labels.

21.     Plaintiff reasonably believed that the Product she purchased was free of concerning Toxicants that, in fact, were present at levels that would gravely concern any reasonable consumer.

22.     Defendant knew or, in the exercise of reasonable care, should have known that the Product labels were false or misleading.

23.    Defendant intended for consumers to rely upon its representations and omissions concerning the Products' nature and quality.

24.    It would be reasonable for consumers to rely—as Plaintiff did—upon Defendant's representations and omissions concerning the Products.

25.    Defendant's misrepresentations and omissions were made with the intent to generate and increase sales of the Products.

26.    Defendant's misrepresentations and omissions were deceptive and misleading for the reasons set forth in this Complaint; and they are ongoing.

27.    By representing the Products as high-quality, premium Products formulated by a team of parents, pediatricians, and nutritionists, Defendant implicitly represented the Products' value to Plaintiff and other consumers.

28.    As a consequence of Defendant's unfair and deceptive practices, Plaintiff and other similarly-situated consumers purchased a product of different and substantially lesser value— one with a higher effective cost—than Defendant represented, under the false impression that the Product was a high-quality, premium Product free of elevated levels of Toxicants.

29.    In fact, because the Products contained elevated levels of Toxicants, they should not have been on the market in the first place, and thus the Products were valueless—i.e., the threat of exposure to high levels of Toxicants would render the Products of no value to reasonable consumers because no reasonable consumer would willingly administer repeated, elevated doses of Toxicants to their children.

30.    Defendant's omission of all reference to the Toxicants deprived Plaintiff and other consumers the opportunity to make an informed choice whether to Purchase the products.

31.    Accordingly, Plaintiff and the Class did not realize the benefit of the bargain and their expectations were not met.

32.    Plaintiff and the Class effectively paid more than the market value represented by the price bargained for. Plaintiff and the class bargained with Defendant on a particular market value

for a product purporting to be a high-quality, premium food—one that would not contain unacceptable levels of Toxicants.

33.    However, unbeknownst to consumers, the Products do contain unacceptable levels of Toxicants; Plaintiff and the Class thus effectively paid for Products that were worth less than they were led to reasonably believe, i.e., Plaintiff and the Class overpaid for the Products.

34.    Thus, through the use of misleading representations and omissions, Defendant obtained enhanced negotiating leverage allowing it to command a price Plaintiff and the Class would not have paid had they been fully informed.

35.    By use of misleading marketing and labeling claims and omissions, Defendant created increased market demand for the Products and increased its market share relative to what its demand and share would have been had it marketed and labeled the Products truthfully.

36.    Plaintiff and the class lost money as a result of Defendant's misrepresentations and omissions in that they did not receive what they reasonably believed they were paying for based upon the misrepresentations and omissions. Plaintiff and the class detrimentally altered their position and suffered damages as a result of Defendant's misrepresentations and omissions.

37.    If Plaintiff had been aware that the Products contained unacceptable levels of any Toxicant, Plaintiff would have purchased a different product or no product at all. In other words, Plaintiff would not have purchased Defendant's Product but for the Defendant's misrepresentations and omissions.

38.    Plaintiff and the Class were exposed to and justifiably relied upon the same material misrepresentations and omissions made on the Products' labels.

**II.    The Truth is Revealed**

39.    The recent Congressional Report released by the U.S. House of Representatives used in-house internal data provided by the Defendant to reveal that, in reality, the Defendant's baby food products contain the Toxicants at-issue.[10]

---

[10] *Report* at 13-15, 22-23, 31, 32-33.

40.     Public health authorities have expressed concern regarding consumption of the Toxicants. For example, according to the Congressional Report, the FDA has expressed concern regarding arsenic levels above 100 ppb in infant rice cereals,[11] arsenic above 10 ppb in drinking water,[12] lead above 5 ppb in drinking water,[13] lead above 50 ppb in juice products,[14] and cadmium above 5 ppb in drinking water.[15] The Defendant's Products routinely tested at levels exceeding these and, according to the Congressional Report, even worse: the Defendant sold snacks it knew had tested positively for Toxicants at high levels.

41.     According to the Congressional Report: with respect to arsenic, Defendant's "puffs" products (those purchased by Plaintiff and fed to Plaintiff's child) tested as high as 180 ppb, while its "cakes" products contained 110 ppb. With respect to lead, its "puffs" products tested as high as 641 ppb; its multi-grain cereal products contained 580 ppb; and its "cakes" products tested as high as 61 ppb. With respect to cadmium, Defendant's multi-grain cereal products contained 49 ppb and its "puffs" contained 35 ppb. The Products also contained mercury—no amount of mercury is acceptable in food products.[16] Again, even after all of these Products tested positive for the Toxicants, Defendant sold those batches of food products to be consumed by young children.[17]

42.     Additionally, independent testing conducted on behalf of the Plaintiff of the same types of Products confirmed that the affected Products still contain high levels of lead, cadmium and arsenic. Specifically, an independent lab tested using Inductively Coupled Plasma-Mass Spectrometry and confirmed the Congressional Report's findings of high concentrations of lead in Defendant's Products. Defendant's teethers contained 30 ppb of lead—twice the EPA's action level for drinking water (15 ppb), over twice the average concentration of lead found in

---

[11] *Id.* at 4.
[12] *Id.* at 13.
[13] *Id.* at 22.
[14] *Id.*
[15] *Id.* at 29.
[16] *Id.* at 2, 3, 15, 22, 23, 31, 32, 45.
[17] *Id.* at 13-15, 22, 23, 31-37.

teething biscuits in FDA's Dataset on Infant Foods (12 ppb),[18] six times higher than FDA's level of concern for bottled water (5 ppb), and nearly 20 times higher than the average concentration of lead in foods tested in FDA's Total Diet Study (1.6 ppb).[19] Six of Defendant's independently-tested Products also indicated the presence of high levels of cadmium.[20] Every Product tested contained at least twice the EPA action level for cadmium in drinking water and the FDA threshold for cadmium in bottled water (both being 5 ppb). Five of the six tested Products also exceeded the average concentration of cadmium in foods analyzed in FDA's Total Diet Study (10 ppb).

### III.    The Danger of the Toxicants Found in Defendant's Products and the Defendant's Sale of the Contaminated Products

43.    The Congressional Report emphasized the dangers posed by the Toxicants in the Defendant's Products:

> Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior. Babies' developing brains are "exceptionally sensitive to injury caused by toxic chemicals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity." The fact that babies are small, have other developing organ systems, and absorb more of the heavy metals than adults, exacerbates their risk from exposure to heavy metals. Exposure to heavy metals at this developmental stage can lead to "untreatable and frequently permanent" brain damage, which may result in "reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior." For example, a recent study estimates that exposure to environmental chemicals, including lead, are associated with 40,131,518 total IQ points loss in 25.5 million children (or roughly 1.57 lost IQ points per child)—more than the

---

[18] FDA conducts regular surveillance of lead and cadmium in foods commonly eaten by toddlers and infants. "Overall, these data indicate levels of lead and cadmium in infant/toddler foods, on average, are relatively low and are not likely to cause a human health concern." The average level of lead in teething biscuits was 12ppb. The Dataset can be viewed at: https://www.fda.gov/food/metals-and-your-food/combination-metals-testing.

[19] FDA conducts a "market-basket survey" of 280 different foods and analyzes the concentrations of lead and cadmium. The average concentrations for lead (1.6 ppb) and cadmium (10.5 ppb) were derived by taking the average of the concentration of all foods analyzed for a particular contaminant. The Total Diet Study can be accessed at: https://www.fda.gov/media/77948/download.

[20] Cadmium concentrations: Happy Baby Organic teethers, pea & spinach (18 ppb), Happy Baby Organic Grain Snack, banana & pumpkin (14 ppb), Happy Baby Organic Grain Snack, strawberry & beet (16 ppb), Happy Baby Organic Grain Snack, sweet potato & carrot (10 ppb), Happy Baby Organic whole grains, Oatmeal (13 ppb), Happy Baby Organic whole grains, Oats & Quinoa (17 ppb).

total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288), and traumatic brain injury (5,827,300) combined. For every one IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000. Well-known vectors of child exposure to toxic heavy metals include lead paint in old housing and water pollution from landfills. Over the decades, a range of federal and state laws and regulations have been passed to protect child health through emissions standards, among other things. **The Food and Drug Administration (FDA) has declared that inorganic arsenic, lead, cadmium, and mercury are dangerous, particularly to infants and children. They have "no established health benefit" and "lead to illness, impairment, and in high doses, death." According to FDA, "even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern." FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure.** The Subcommittee on Economic and Consumer Policy's investigation has found another source of exposure: baby foods. According to documents obtained from baby food manufacturers, toxic heavy metals, such as arsenic, cadmium, lead, and mercury are present at substantial levels in both organic and conventional baby foods. Currently, there is no federal standard on, or warning to parents and caregivers about, these toxins.[21]

With respect to arsenic, the Congressional Report states:

Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR). The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children." Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children." This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children." A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores." The authors pegged 5 ppb as an important threshold. Likewise, a study of children in Spain found that increasing arsenic exposure led to a decrease in the children's global motor, gross motor, and fine motor function scores. Boys in particular were more susceptible to arsenic's neurotoxicity.[22]

---

[21] *Report* at 9-10 (internal citations omitted).
[22] *Id.* (internal citations omitted).

With respect to lead, the Congressional Report states:

> Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Even small doses of lead exposure are hazardous, particularly to children. Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. According to FDA, lead is especially dangerous to "infants" and "young children." FDA acknowledges that: High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system. Neurological effects from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time. Lead exposure severely affects academic achievement in children. Even at low levels, early childhood lead exposure has a negative impact on school performance. Two separate studies of schoolchildren in Detroit and Chicago public schools found a strong inverse relationship between lead exposure and test scores. In the Detroit study, there was a "significant association" between early childhood lead exposure and decreased standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement. The Chicago study found that higher blood lead concentrations were associated with lower reading and math scores in 3rd grade children. Increased blood lead concentrations correlated with a 32% increase in the risk of failing reading and math. The cognitive effects of early childhood lead exposure appear to be permanent. In one study, adults who previously had lead-associated developmental delays continued to show persisting cognitive deficits, demonstrating the long-lasting damage of lead exposure.[23]

With respect to cadmium, the Congressional Report states:

> Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Cadmium is associated with decreases in IQ, as well as the development of ADHD. A 2018 study found that cadmium exposure negatively affected children's Full Scale IQ, particularly among boys. Boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure. A 2015 study similarly found a significant inverse relationship between early cadmium exposure and IQ. A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.[24]

---

[23] *Id.* at 11 (internal citations omitted).
[24] *Id.* at 12 (internal citations omitted).

With respect to mercury, the Congressional Report states:

> Mercury is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health. Studies of mercury's effect on childhood development have primarily been conducted by considering the mother's exposure to mercury while pregnant. In these instances, "pre-natal mercury exposure has been consistently associated with adverse subsequent neuro-development." And pre-natal mercury exposure is also related to poorer estimated IQ. Beyond prenatal exposure, higher blood mercury levels at "2 and 3 years of age were positively associated with autistic behaviors among preschool-age children.[25]

44.     Defendant knew of these health dangers. According to the Congressional Report, the Defendant tested its products for the existence of these Toxicants, and, despite testing positive and at high levels, the Defendant still sold the Products.[26] In fact, according to the Congressional Report, the **Defendant sold these products every single time they tested positive** and never pulled the tested products from store shelves or off of internet marketplaces.[27]

45.     Defendant has shown no concern for the health risks faced by the end-users of its Products—vulnerable young children—in fact, Defendant continues today selling these Products without any indication to consumers that the Products contain alarming levels of Toxicants.

46.     Further, Defendant created internal thresholds for Toxicants that were more relaxed than the levels recognized by public health and government authorities for specific Toxicants. For example, "Nurture … ignored the only final standard that the FDA has set. FDA set a 100 PPB inorganic arsenic limit for infant rice cereal. Rather than comply with that limit, Nurture set its internal standards 15% higher, at 115 PPB inorganic arsenic."[28]

47.     Defendant's manipulation of internal testing standards for the Toxicants belies any representation about concerns for the welfare of children. Plaintiff relied on these representations—unaware that they were false, and uninformed, by design, as to the presence of the Toxicants.

---

[25] *Id.* at 12-13 (internal citations omitted).
[26] *Id.* at 13-15, 22, 23, 31-37.
[27] *Id.* at 31-37.
[28] *Id.* at 37.

48. Not only did the Defendant knowingly mislead parents into believing the Products were safe, Defendant charged a premium for them. Plaintiff and the Class would not have purchased the Products were they aware of the presence of the Toxicants or, alternatively, they would not have purchased at the Products' offered price and terms.

## IV. Due to Defendant's Misconduct, Plaintiff and the Class Suffered Economic Injury

49. Plaintiff and the Class were injured economically when they purchased the Products. As alleged, *inter alia*, at ¶¶ 23-38, Plaintiff and the Class received something worth less than what they paid for, and did not receive the benefit of their bargain. They paid for Products which were supposed to be wholesome, but were not. No reasonable consumer would have purchased or paid as much or as frequently for the Products had they known the Products contained elevated levels of Toxicants. Defendant knew of the Toxicants and the levels at which they occur in the Products, but chose not to disclose this material information to their consumers in an effort to persuade them they were buying wholesome Products rather than Products with elevated levels of Toxicants.

## CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action on behalf of herself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on behalf of members of the following proposed Classes:

**National Class**. All persons within the United States who purchased one or more of the Products from the beginning of the applicable statutory period through present (the "National Class").

**Multistate Class**. All persons within the States of California, Florida, Illinois, New York, North Carolina, Ohio, and Washington who purchased one or more of the Products from the beginning of the applicable statutory period through present (the "Multistate Class").

**Ohio Class**. All persons within the State of Ohio who purchased one or more of the Products from the beginning of the applicable statutory period through present (the "Ohio Class").

51.    Unless otherwise stated, use of the term "Class" throughout this Complaint refers to The National Class the Multistate Class and the Ohio Class.

52.    Excluded from the Class are Defendant, any of their respective members, affiliates, subsidiaries, officers, directors, employees, successors or assigns, the judicial officers, and their immediate family members; as well as the Court staff assigned to this action.

53.    Plaintiff reserves the right to modify or amend Class definitions as appropriate during the pendency of this Action.

54.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as individual Class members would use to prove those elements in individual actions alleging the same claims

55.    This action has been brought and may be properly maintained as a class action under the criteria of FRCP 23:

55a.    **Numerosity – FRCP Rule 23(a)(1).** The members of each of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class numbers is unknown to Plaintiff but is likely to be ascertained by the Defendant's records. At a minimum, there likely are tens of thousands of Class Members.

55b.    **Commonality and Predominance – FRCP Rule 23(a)(2),(b)(3) and Local Rule 23.1(b)(2)(C).** This action involves questions of law and fact common to the Classes, which predominate over any individual questions, including:

    i.    whether the Defendant engaged in the conduct alleged herein;

    ii.    whether the Defendant's course of conduct alleged herein violates the statutes and other laws that are pled in this Complaint;

    iii.    whether Defendant intended for consumers to rely upon its representations and omissions;

    iv.  whether reasonable consumers would rely upon Defendant's representations and omissions;

    v.  whether Defendant knew or should have known its representations and omissions were false or misleading;

    vi.  whether the Defendant was unjustly enriched by retaining monies from the sale of the Products at issue;

    vii.  whether certification of the Class is appropriate under F.R.C.P. Rule 23;

    viii.  whether Plaintiff and the Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief; and

    ix.  the amount and nature of the relief to be awarded to the Plaintiff and the Class, including whether Plaintiff and the Class are entitled to punitive damages.

55c. **Typicality – FRCP Rule(a)(3).** Plaintiff's claims are typical of the other Class members because the Plaintiff, as well as the members of the Class, paid for Defendant's contaminated Products at retail. Plaintiff and the members of the Class relied on the representations and omissions made by the Defendant prior to making their purchase of the Products at issue. Plaintiff and the Class paid for Defendant's products at retail and would not have purchased them (or would have paid substantially less for them) had they known that the Defendant's representations were untrue and/or had they possessed the information Defendant omitted from the labels regarding the Toxicants.

55d. **Adequacy of Representation – FRCP Rule 23(a)(4).** Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and her counsel. Pursuant to Local Rule 23.1(b)(2)(B), Plaintiff's counsel believes they are best suited to lead a litigation of this sort, as the firms who are listed on this Class Action Complaint are all well-versed in class action consumer fraud litigation. Each of the firms listed have been practicing said litigation for at

least the past decade and have collected millions of dollars in settlements and verdicts on behalf of injured consumers.

55e.   **Superiority of Adjudication as a Class Action – FRCP Rule 23(b)(3).** To preserve judicial economy, this case will be best maintained as a class action, which is superior to other methods of individual adjudication of these claims. Pursuant to Local Rule 23.1(b)(2)(D), this action is best maintained as a class action because of the large number of consumers affected by the alleged violations of law as well as the relatively smaller-purchase economic damages being sought by Plaintiff and the Class. The damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct, such that it would be virtually impossible for the Class to redress the wrongs done to them and they would have little incentive to do so given the amount of damage each Class member has suffered when weighed against the costs and burdens of litigation. The class procedure presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and supervision by a single court.

55f.   **Certification of Specific Issues – FRCP Rule 23(c)(4).** To the extent that a Class does not meet the requirements of FRCP Rules 23(b)(2) or (b)(3), Plaintiff seeks certification of issues that will drive this litigation toward resolution.

55g.   **Declaratory and Injunctive Relief – FRCP Rule 23(b)(2).** The Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole. Unless a classwide injunction is issued, Defendant will continue to, or allow its resellers to, advertise, market, promote, and sell the Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Class will continue to be misled, harmed, and denied their rights under the law.

56.   Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:

### OHIO'S CONSUMER SALES PRACTICES ACT (ORC §§ 1345.01, et seq.)
(Individually and on behalf of the Ohio Class)

57.     Plaintiff realleges and incorporates by reference ¶¶ 1-56.

58.     Plaintiff brings this claim individually and on behalf of the Ohio Class (referred to throughout this Count as "the Class").

59.     Plaintiff and the Class, who are consumers as defined by the CSPA, desired and expected to purchase Products that were wholesome and did not contain unacceptable levels of Toxicants, consistent with Defendant's representations (with respect to the Product packaging) and omissions (with respect to not disclosing the Products at issue were contaminated and contained elevated and unacceptable levels of Toxicants). Defendant's conduct is not unique to the allegations as made solely by Plaintiff, but is systematic and part of a larger course of conduct that applies uniformly to the Class as a whole.

60.     The CSPA provides that: "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

61.     The unfair or deceptive acts include the Defendant knowingly misrepresenting the products at issue through its statements on the labels and in various advertising media (e.g., social media, online, etc.), through its omissions (by not including on packaging that the products were contaminated with elevated levels of Toxicants), ambiguities, half-truths, other such actions.

62.     Defendant knew that Plaintiff and the Class—and any reasonable consumer—would rely on its misrepresentations and omissions in deciding whether to purchase the Products.

63.     The false and misleading nature of the misrepresentations and omissions could not have been known to Plaintiff and the Class, and any reasonable consumer would have been misled by this deceptive course of conduct.

64.    Defendant's omissions were unfair to consumers and were deceptive because they concealed information that would be of significant importance to any reasonable consumer engaging in the consumer transactions at issue here.

65.    Defendant knew that its omissions and its representations of fact concerning the Products were material and likely to mislead consumers, as they did with respect to Plaintiff and the Class.

66.    Defendant's course of conduct caused injury to the Plaintiff and the Class by: misleading consumers into purchasing goods which represented or omitted qualities that they did or did not have; misleading consumers into paying a premium for goods that otherwise would have been useless or valued far less than the price at which they were sold; and misleading consumers into feeding their children foods containing unacceptable levels of Toxicants.

67.    Plaintiff and the Class were directly harmed by Defendant's conduct, as they would not have paid for the Products at the same price or on the same terms—or at all—had they known the truth that was obscured by Defendant's omissions and misrepresentations. The harm includes any premium paid and the damages alleged, *inter alia*, in ¶¶ 23-38.

68.    Accordingly, Plaintiff and the Class seek all available relief pled in the WHEREFORE clause of this Complaint.

## SECOND CLAIM FOR RELIEF:

## OHIO DECEPTIVE TRADE PRACTICES ACT (ORC §§ 4165.01, et seq.)
(Individually and on behalf of the Ohio Class)

69.    Plaintiff realleges and incorporates by reference ¶¶ 1-56.

70.    Plaintiff brings this claim individually and on behalf of the Ohio Class (referred to throughout this Count as "the Class").

71.    Plaintiff and the Class purchased Defendant's Products under the impression that the Products were fit for their intended use, which is to feed to young children and toddlers. Plaintiff and other reasonable consumers relied on Defendant's representations and omissions when they

purchased the Products. Defendant represented that the Products have characteristics or qualities that they do not have, in violation of the statute.

72.     But for the Defendant's deceptive labeling, advertising, and general course of conduct, Plaintiff and the Class would not have made the purchases that she did (or would have paid substantially less for those purchases or made fewer purchases).

73.     Plaintiff and the Class were directly harmed by Defendant's conduct, as they would not have paid for the Products at the same price or on the same terms—or at all—had they known the truth that was obscured by Defendant's omissions and misrepresentations. The harm includes any premium paid and the damages alleged, *inter alia*, in ¶¶ 23-38.

74.     Accordingly, Plaintiff and the Class seek all available relief pled in the WHEREFORE clause of this Complaint.

### THIRD CLAIM FOR RELIEF:
### VIOLATION OF VARIOUS STATE CONSUMER PROTECTION ACTS
#### (Individually and on behalf of the Multistate Class)

75.     Plaintiff realleges and incorporates by reference ¶¶ 1-56.

76.     Plaintiff brings this claim for deceptive acts and practices in violation of various states' consumer protection statutes individually, as to Ohio law, and on behalf of the Multistate Class, as to the laws of the other states (referred to throughout this count as "the Class").

77.     The various state laws cited below, upon which this Count is premised, are consonant with one another and with Ohio law, both procedurally and substantively.

78.     Defendant has engaged in deceptive, unfair, unconscionable, and fraudulent acts and practices that have caused actual damages to Plaintiff and the Class, as described herein, including the knowing and intentional misrepresentations and omissions described with respect to the marketing, advertising, promotion, packaging, labeling, and sale of the Products.

79.     Defendant's deceptive, unfair, unconscionable, and fraudulent acts and practices have been carried out in the course of conducting Defendant's business, trade, and commerce.

80.    Such acts and practices—including Defendant's intentional efforts to mislead consumers by the misrepresentations and omissions alleged throughout this Complaint—are willful, unfair, unconscionable, deceptive, immoral, unethical, oppressive, unscrupulous, contrary to public policy, and substantially injurious to consumers, including Plaintiff and the Class.

81.    Such acts and practices, including Defendant's misrepresentations and omissions, have the capacity to mislead, deceive, and confuse a substantial portion of the public and all reasonable consumers in a material way and have in fact misled, deceived, and confused Plaintiff and the Class in a material way, as Defendant intended.

82.    Defendant's intentionally false, deceptive, misleading, and confusing representations and omissions would be material to any ordinary, average, and reasonable consumer's decision whether to buy the Product, given that they pertain to a fundamental and important feature of the Products. No reasonable consumer would have purchased the Products but for Defendant's acts and practices, including its misrepresentations and omissions, described throughout this Complaint.

83.    Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendant's acts and practices, including the misrepresentations and omissions described herein.

84.    Defendant's acts are unconscionable and actuated by bad faith, lack of fair dealing, actual malice, are accompanied by a wanton and willful disregard for consumers' well-being, and are motivated solely by the desire for financial gain.

85.    As a direct and proximate result of Defendant's deceptive practices, Plaintiff and the Class have sustained actual damages including but not limited any price premium paid and damages alleged, *inter alia*, in ¶¶ 23-38.

86.    Plaintiff's claims under Ohio law and on behalf of the Ohio Class (excepting Plaintiff's warranty claims) are representative of similar claims available to Multistate Class members under the laws of other states, which are consonant with one another and with Ohio law. Defendant's acts and practices described herein constitute unfair competition and deceptive,

unfair, unconscionable, and fraudulent acts and practices in violation the following state consumer protection statutes:

    a.  California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code §§ 1750, *et seq.*) and California's Unfair Competition Law ("UCL") (Bus. & Prof. Code §§ 17200 *et seq.*);

    b.  Florida Deceptive and Unfair Trade Practices Act (§§ 501.201, Fla. Stat., *et seq.*);

    c.  Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. 505/1, *et seq.*);

    d.  New York Deceptive Acts and Practices Act (N.Y. Gen. Bus. Law §§ 349, *et seq.*);

    e.  North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*);

    f.  Ohio Consumer Sales Practices Act (ORC §§ 4165.01, *et seq.*) and Ohio Deceptive Trade Practices Act (ORC §§ 4165.01, *et seq.*); and

    g.  Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*

87. Accordingly, Plaintiff and the Class seek a declaration or declaratory judgment that Defendant's acts and practices have violated and continue to violate the foregoing laws and all other available relief pled in the WHEREFORE clause of this Complaint.

**FOURTH CLAIM FOR RELIEF:**

**UNJUST ENRICHMENT**

(Individually and on behalf of the National Class, the Multistate Class, and the Ohio Class)

88. Plaintiff realleges and incorporates by reference ¶¶ 1-56.

89. Plaintiff brings this claim for unjust enrichment, also referred to as quasi-contract or restitution, in violation of the law of the various states, all of which are consonant with one another, individually and on behalf of the National Class, the Multistate Class, and the Ohio Class (referred to throughout this Count as "the Class").

90.     Plaintiff and the Class purchased Defendant's products and paid a premium for said products—products which misrepresented or omitted the quality of the products which justified the premium.

91.     Plaintiff and the Class paid more than the fair value of Defendant's Products as reflected in any price premium paid and as alleged, *inter alia*, in ¶¶ 23-38.

92.     Because of Defendant's wrongful acts and practices, Defendant charged, and Plaintiff and the Class paid, a higher effective price for the Products than that which reflects their true value and Defendant accordingly obtained monies that rightfully belong to Plaintiff and the Class.

93.     Defendant received a direct benefit from Plaintiff and the Class in the form of Product sales, increased market share for the Products, and resulting Products. Defendant obtained this benefit by its misrepresentations and omissions because those misrepresentations and omissions induced reasonable consumers to purchase the Products they would not otherwise have purchased.

94.     Defendant appreciated this benefit and knowingly accepted it at the expense of, and to the detriment of, Plaintiff and the Class. Defendant currently retains this benefit.

95.     Under the circumstances, it would be inequitable and unjust, and it would violate fundamental principles of justice, equity, and good conscience, for Defendant to retain this wrongfully obtained benefit.

96.     Accordingly, Plaintiff and the Class seek restitution and disgorgement of all inequitably retained monies resulting from the purchases made by Plaintiff and the Class and all other available relief pled in the WHEREFORE clause of this Complaint.

## JURY DEMAND AND PRAYER FOR RELIEF

97.     Plaintiff, individually and on behalf of the Class, demands a jury trial on all issues so triable that are alleged herein.

98.     WHEREFORE, Plaintiff requests the following relief against Defendant:

a.   an order certifying this action as a class action representing each of the Classes defined herein pursuant to FRCP 23; designating Plaintiff as representative for said Classes; and appointing counsel of record as class counsel;

b.   a declaration or declaratory judgment that Defendant's conduct has violated and continues to violate the statutes cited herein;

c.   an order enjoining Defendant to refrain from the acts and practices cited herein and to undertake an immediate public information campaign to inform members of each of the Classes as to its prior practices;

d.   an order requiring imposition of a constructive trust and and/or disgorgement of Defendant's ill-gotten gains and to pay restitution to Plaintiff and all members of each of the Classes to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice;

e.   an award of damages, including all available statutory and punitive damages, pursuant to the statutes and the causes of action pled herein;

f.   distribution of any monies recovered on behalf of members of each of the Classes via fluid recovery or *cy pres* recovery where necessary and applicable, to prevent Defendant from retaining the benefit of its wrongful conduct;

g.   an award of all recoverable costs and expenses, including reasonable fees for Plaintiff's attorneys; and

h.   an award of pre- and post-judgment interest to Plaintiff and members each of the Classes if applicable; and, ordering further relief as this Court deems just and proper.

DATED: April 6, 2021

Respectfully submitted,

*s/ William F. Cash III*

William F. Cash III (Ohio Bar No. 84482)
bcash@levinlaw.com
Matthew D. Schultz (Fla. Bar No. 540328)*
mschultz@levinlaw.com
Rebecca K. Timmons (Fla. Bar No. 121701)*
btimmons@levinlaw.com
**LEVIN PAPANTONIO RAFFERTY**
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140

Andrei V. Rado*
Blake Hunter Yagman*
**MILBERG PHILLIPS GROSSMAN LLP**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone:     212-594-5300
Email:  arado@milberg.com
            byagman@milberg.com

Gregory F. Coleman*
Rachel Soffin*
**GREG COLEMAN LAW P.C.**
800 S. Gay St., Suite 1100
Knoxville, Tennessee 37929
Telephone:     865-247-0080
Email:  gcoleman@gregcolemanlaw.com
            rsoffin@gregcolemanlaw.com

Daniel K. Bryson*
Harper T. Segui*
**WHITFIELD BRYSON LLP**
900 W. Morgan St.
P.O. Box 12638
Raleigh, North Carolina 27605
Telephone:     919-600-5000
Email:  dan@whitfieldbryson.com

Melissa S. Weiner*
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402
Telephone:     (612) 389-0600
Email:  mweiner@pswlaw.com

*Attorneys for Plaintiff & The Proposed Classes*

*Pro Hac Vice Forthcoming